UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| PAUL M. HUSKISSON, | ) |
|                            Petitioner, | ) |
|                                v. | )    No. 1:21-cv-00420-SEB-MJD |
| UNITED STATES OF AMERICA, | ) |
|                            Respondent. | ) |

**Order Discussing Motion for Relief Pursuant to 28 U.S.C. § 2255
and Denying Certificate of Appealability**

For the reasons explained in this Order, the motion of Petitioner Paul M. Huskisson for relief pursuant to 28 U.S.C. § 2255 must be **denied** and the action dismissed with prejudice**.** In addition, the Court finds that a certificate of appealability should not issue**.**

**I. The § 2255 Motion**

A motion pursuant to 28 U.S.C. § 2255 is the presumptive means by which a federal prisoner can challenge his conviction or sentence. *See Davis v. United States*, 417 U.S. 333, 343 (1974). A court may grant relief from a federal conviction or sentence pursuant to § 2255 "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "Relief under this statute is available only in extraordinary situations, such as an error of constitutional or jurisdictional magnitude or where a fundamental defect has occurred which results in a complete miscarriage of justice." *Blake v. United States*,

1

723 F.3d 870, 878-79 (7th Cir. 2013) (citing *Prewitt v. United States*, 83 F.3d 812, 816 (7th Cir. 1996); *Barnickel v. United States*, 113 F.3d 704, 705 (7th Cir. 1997)).

## II. Factual Background

### A. Crime, Arrest, and Search Warrant

As described by the U.S. Court of Appeals for the Seventh Circuit in Mr. Huskisson's direct appeal, the facts of his crime are as follows:

> On February 5, 2016, Drug Enforcement Administration (DEA) agents arrested Anthony Hardy on drug conspiracy charges and related offenses. Seeking to cut a deal, Hardy immediately admitted his role in the conspiracy, led DEA agents to his drugs and guns, and rolled over on two local drug dealers. One of those dealers was Paul Huskisson. Huskisson was previously unknown to the Indianapolis DEA task force, but Hardy provided plenty of intelligence on his dealings with Huskisson, including that:
>
> • Hardy purchased varying quantities of methamphetamine from Huskisson six times over the preceding five months, for $ 8,000 per pound.
>
> • Hardy bought methamphetamine both at Huskisson's house and at a car lot Huskisson owned.
>
> • Huskisson told Hardy that Huskisson's source expected a shipment of ten to twelve pounds of methamphetamine the next day, February 6. Hardy believed he could buy some or all of that methamphetamine from Huskisson.
>
> As further proof of Huskisson's involvement in the drug conspiracy, Hardy called Huskisson that day. DEA agents, including Special Agent Michael Cline, listened to and recorded that conversation with Hardy's consent. On the call, Huskisson agreed to deliver ten to twelve pounds of methamphetamine to Hardy.
>
> The next day, Hardy and Huskisson arranged the details of the transaction through a series of telephone calls (again, recorded by the DEA with Hardy's consent). In all, Cline listened in on nine phone calls between the two. Huskisson and Hardy agreed the drug deal would occur at Huskisson's home that night. At that point, the DEA agents did not apply for a search warrant, believing they needed to corroborate that there was methamphetamine at Huskisson's residence before filing the application.
>
> Hardy stayed with Cline until around 5:30 p.m., when Hardy left for Huskisson's house. Cline tailed Hardy's car until it arrived at Huskisson's house about ten minutes later. Cline waited in his car and watched Hardy enter the house, with

> an entry team on standby. This entry team comprised DEA agents and local law enforcement, including Indiana State Police detective Noel Kinney.
>
> At 6:15 p.m., Cline saw a car pull into the house's driveway. Two men (later identified as Jezzar Terrazas-Zamarron and Fredi Aragon) got out of the car with a cooler, approached the house, and entered. Ten minutes later, Hardy walked outside and gave a prearranged signal to indicate he had seen methamphetamine in the house.
>
> Once Hardy gave the signal, Cline ordered the entry team to enter Huskisson's house and secure the scene. At the time, no search warrant had been issued. The entry team entered the house and arrested Terrazas, Aragon, and Huskisson, who refused to consent to a search of his residence. Upon entry, officers saw in plain sight in the kitchen an open cooler with ten saran-wrapped packages of a substance which field tested positive for methamphetamine. The three men were taken into custody. Meanwhile, Cline remained outside, pretending to arrest Hardy to disguise his role as an informant. Cline then left with Hardy to prepare applications for search warrants for Huskisson's house and his workplace.
>
> Later that night, DEA agents filed the warrant application for Huskisson's house. The application detailed Hardy's history of drug deals with Huskisson, as well as the many phone calls between Hardy and Huskisson in the last twenty-four hours. The application also included Hardy's description of what transpired while he was inside Huskisson's house: when Hardy arrived, Huskisson called his suppliers and told Hardy they would arrive shortly. Two minutes later, Terrazas came to the door and explained he had five pounds of methamphetamine, only half of what Huskisson had expected. After speaking with Huskisson, Terrazas placed a phone call and Aragon walked in with a cooler. Aragon took ten saran-wrapped packages out of the cooler that appeared to Hardy to be methamphetamine. Hardy then went outside to signal Cline.
>
> In addition to this information, the warrant application contained the following two sentences that underlie this appeal: "The law enforcement officers observed an open cooler with ten saran wrapped packages that contained suspected methamphetamine. The suspected methamphetamine later field tested positive for the presence of methamphetamine." The magistrate judge issued a search warrant for Huskisson's house around 10:30 p.m. the night of Huskisson's arrest, about four hours after the initial entry.

*United States v. Huskisson*, 926 F.3d 369, 371-72 (7th Cir. 2019) (footnote omitted).

Mr. Huskisson was charged with one count of possession with intent to distribute 500 grams or more of a mixture or substance containing methamphetamine, in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. *Id.* at 372. Mr. Huskisson was initially represented by retained

3

counsel John Tompkins. *United States v. Huskisson*, No. 1:16-cr-00048-SEB-TAB-1 ("Crim. Dkt."), dkt. 21.

### B. Motion to Suppress

Mr. Huskisson—by Attorney Tompkins—filed a motion to suppress the evidence found at his home, arguing that no exigent circumstances justified the warrantless entry. Crim. Dkts. 65, 66. The Court held a suppression hearing and ultimately denied the motion, finding:

> Accordingly, for purposes of Defendant's motion to suppress, we assume that the agents' warrantless entry in this case was unlawful. However, "[t]he fact that police behaved illegally does not mean that the remedy of excluding evidence is necessarily appropriate. *United States v. Etchin*, 614 F.3d 726, 734 (7th Cir. 2010). Upon careful review of the parties' submissions, the testimony and oral argument presented at the suppression hearing, and the relevant case law, we find that despite the illegal entry, all evidence discovered during the warrantless seizure as well as the search performed after the warrant was secured is admissible.

Cr. Dkt. 76 at 4. The Court explained that there was no dispute that probable cause to support a search warrant existed when Mr. Hardy exited Mr. Huskisson's house and gave the prearranged signal to DEA agents that methamphetamine was inside. *Id.* at 6. The Court found that the warrant affidavit improperly contained references to the methamphetamine seized following the illegal entry but concluded that "the magistrate judge would ultimately have issued the search warrant even without reference to the evidence seized and information obtained following the illegal entry because, even without those references, the warrant application was still sufficient to establish probable cause." *Id.* at 9. The Court also made a factual finding that the agents planned to and would have sought a search warrant regardless of the discovery of the methamphetamine packages. *Id.* at 10.

Later, Attorney Tompkins withdrew his appearance, and the Court appointed attorney James Edgar to represent Mr. Huskisson. Crim. Dkts. 129, 131. After Attorney Edgar appeared, Mr. Huskisson filed a pro se motion asking the Court to reconsider its ruling on the motion to suppress. Crim. Dkt. 135. The Court denied the motion, finding that Mr. Huskisson was trying to relitigate the Court's factual conclusions. Crim. Dkt. 165 at 6.

### C. Trial

At trial, Mr. Huskisson—by Attorney Edgar—renewed his motion to suppress. Crim. Dkt. 179; Crim. Dkt. 211 at 64. The Court denied the motion. Crim. Dkt. 211 at 70-71. The jury ultimately found Mr. Huskisson guilty as charged, and he was sentenced to 240 months in prison. Dkt. 194.

### D. Appeal

Mr. Huskisson appealed, challenging the denial of the motion to suppress. The Seventh Circuit affirmed. It concluded that: (1) the application for the search warrant for Mr. Huskisson's home contained enough information to establish probable cause even after removal of evidence obtained through illegal entry; and (2) this Court did not clearly err in its factual finding that the decision to obtain a search warrant for Mr. Huskisson's home was not affected by the illegal entry into the house. *Huskisson*, 926 F.3d at 376-77.

It explained:

> As a general matter, the exclusionary rule prohibits introduction of evidence that the police obtained illegally. But this rule has exceptions. Relevant here is the independent source doctrine, which holds that illegally obtained evidence is admissible if the government also obtains that evidence via an independent legal source, like a warrant. The independent source doctrine recognizes that the goal of the exclusionary rule is to put the police in the same, not a worse, position than they would have been in if no police error had occurred.
>
> \*\*\*

> [T]o decide whether the warrant is an independent legal source, we ask two questions: first, did the illegally obtained evidence affect the magistrate's decision to issue the warrant? And second, did the illegally obtained evidence affect the government's decision to apply for the warrant?
>
> \*\*\*
>
> In the district court, Huskisson did not dispute the warrant application submitted to the magistrate judge contained enough information to establish probable cause to believe that the entry team would discover evidence of a crime inside at the moment that they knocked on his door. Even if he had, the search warrant application contained plenty of untainted evidence of probable cause. It detailed Hardy's initial admissions to agent Cline about his drug-dealing history with Huskisson, Hardy's nine phone calls with Huskisson, Hardy's signal to Cline, and Hardy's account of what he saw in Huskisson's house after he arrived. Presented with that amount and nature of evidence, the magistrate judge would have issued the search warrant even without the discussion of the field-tested methamphetamine.

*Id.* at 376 (internal citations and footnotes omitted). It went on to address the question of whether law enforcement's illegal entry and field test affected the decision to apply for a warrant. Concluding that it did not, the court stated:

> The district court faithfully applied the standards we laid out in *Markling* and *Etchin* to determine the government's motives in filing the search warrant application. The court carefully weighed the evidence from both sides; when faced with two inconsistent statements from the same witness, the court credited one based on the totality of the evidence. In so doing, the district court concluded that an errant statement by Detective Kinney did not outweigh the other evidence of the government's plan to request a search warrant, regardless of what they found in the house. This was not a "one-off," ill-considered decision by the district court. Rather, before, during, and after the jury trial, the court closely tracked the issue with its superior vantage point hearing and seeing the witnesses and presiding over the presentation of all the evidence. This decision was well-reasoned and well-supported, so we do not reverse it.

*Id.* at 376-77 (footnote omitted).

In concluding, the court explained that everyone agreed that the DEA team entered Mr. Huskisson's house unlawfully and that ordinarily the evidence found here would be excluded. *Id.* at 377. It went on to state, "But because the government had so much other evidence of

6

probable cause, and had already planned to apply for a warrant before the illegal entry, the evidence is admissible." *Id.*

### III. Discussion

In his 61-page supporting memorandum and 16-page reply brief, Mr. Huskisson raises two arguments, which the Court summarizes as follows: (1) whether trial counsel was ineffective by failing to argue that Mr. Hardy's signal could not have served as an independent source of probable cause justifying entrance into Mr. Huskisson's residence because the signal was "wholly connected" to the unlawful entry and search of the residence, *see, e.g.*, dkt. 5 at 23; and (2) whether pre-trial counsel was ineffective by focusing on the exigent circumstances argument and failing to investigate and develop the argument that the warrantless entry was unauthorized because Mr. Hardy was acting as a government agent and because Mr. Hardy was not a confidential informant of proven reliability, *see, e.g.*, dkt. 5 at 55.

A petitioner claiming ineffective assistance of counsel bears the burden of showing (1) that trial counsel's performance fell below objective standards for reasonably effective representation and (2) that this deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 688–94 (1984); *Resnick v. United States*, 7 F.4th 611, 619 (7th Cir. 2021). If a petitioner cannot establish one of the *Strickland* prongs, the court need not consider the other. *Groves v. United States,* 755 F.3d 588, 591 (7th Cir. 2014). To satisfy the first prong of the *Strickland* test, the petitioner must direct the Court to specific acts or omissions of his counsel. *Wyatt v. United States,* 574 F.3d 455, 458 (7th Cir. 2009). The Court must then consider whether in light of all of the circumstances counsel's performance was outside the wide range of professionally competent assistance. *Id.* On the prejudice prong, a petitioner "must show that but for counsel's errors, there is a reasonable probability that the result would have been

7

different." *Perrone v. United States*, 889 F.3d 898, 908 (7th Cir. 2018) (cleaned up). Under this standard, an attorney cannot be ineffective for failing to present an issue that is certain to fail. *See Warren v. Baenen,* 712 F.3d 1090, 1104 (7th Cir. 2013) ("Counsel is not ineffective for failing to raise meritless claims."); *United States v. Carter*, 355 F.3d 920, 924 (7th Cir. 2004) ("First, counsel cannot be said to be deficient for failing to take frivolous action, particularly since a frivolous effort takes attention away from non-frivolous issues. Second, it is evident that failing to make a motion with no chance of success could not possibly prejudice the outcome."). In addition, when counsel's "purported deficiency is based on a failure to investigate," a petitioner must "allege what the investigation would have produced." *Long v. United States*, 847 F.3d 916, 920 (7th Cir. 2017) (internal quotation omitted).

### A. Ground One: Concession of Probable Cause and Failure to Argue "Uninterrupted Course of Action"

Mr. Huskisson's first assignment of error focuses on what his counsel did after the motion to suppress was denied. In Mr. Huskisson's view, the Court *sua sponte* inserted the independent source doctrine into the suppression issue in its ruling on the motion to suppress, thereby depriving the parties of the chance to fully address the doctrine. *See, e.g.*, dkt. 5 at 20. Mr. Huskisson contends that, after the Court made that ruling, his counsel should have challenged the Court's application of the independent source doctrine rather than continuing to concede that probable cause existed to enter his residence at the time of entry. *See, e.g.*, dkt. 25 at 12. Specifically, as Mr. Huskisson sees it, the Court concluded that Mr. Hardy's signal *was* the independent source providing untainted evidence of probable cause in the warrant application, and counsel should have argued that the signal could not be an "independent source" of probable cause because the signal was "wholly connected" to the illegal entry. *See, e.g.*, dkt. 5 at 15, 23.

8

At the outset, the Court notes that a significant portion of Mr. Huskisson's argument on this point is based on the theory that the Court erred in its factual finding that law enforcement would have sought a warrant regardless of the discovery of the methamphetamine packages. *See, e.g.*, dkt. 5 at 9 ("Detective Kinney, at the suppression hearing all but admitted that the agents would not have sought a warrant unless they discovered drugs in plain view during the protective sweep."). As the government argues, however, Fourth Amendment claims are not cognizable on collateral review, *see Stone v. Powell*, 428 U.S. 465, 482 (1976), so to the extent that Mr. Huskisson is simply seeking to rehash arguments already made about why a Fourth Amendment violation occurred, he cannot do so here. Similarly, the Seventh Circuit has already declined to overturn the Court's factual finding about whether the DEA would have sought a warrant regardless of the discovery of the methamphetamine packages. *Huskisson*, 926 F.3d at 376-77. Mr. Huskisson cannot revive arguments about the propriety of that finding in his § 2255 motion. *See Fuller v. United States*, 398 F.3d 644, 648 (7th Cir. 2005) ("In the context of § 2255 petitions, the law of the case doctrine dictates that once this court has decided the merits of a ground of appeal, that decision establishes the law of the case and is binding on a [court] asked to decide the same issue in a later phase of the same case, unless there is some good reason for reexamining it.") (internal citations and quotations omitted). As a result, the Court focuses its analysis only on the question of whether Mr. Huskisson's counsel was ineffective for failing to raise the arguments he identifies.

In addition, Mr. Huskisson devotes considerable space to criticizing what he characterizes as the Court's *sua sponte* injection of the independent source doctrine into the case, contending that the parties never had a chance to be fully heard on the issue and that a new suppression hearing should thus be held. *See, e.g.*, dkt. 5 at 20. But even if the parties had

9

somehow been deprived of the ability to make argument on the independent source doctrine before this Court, the issue was fully briefed to the Seventh Circuit on direct appeal. And, indeed, the Seventh Circuit issued a published opinion discussing the application of that doctrine to this case, concluding that that the search warrant application contained "plenty" of untainted—that is independent—evidence of probable cause, including but not limited to Mr. Hardy's signal. *Huskisson*, 926 F.3d at 376. As explained, Mr. Huskisson cannot revisit the Seventh Circuit's conclusions by filing a § 2255 motion. And he has not identified any additional evidence that might be developed during a new hearing that would have changed the Seventh Circuit's analysis. To the contrary, he states that counsel in this Court had "all the information he needed" to show that the independent source doctrine did not apply. Dkt. 25 at 12.

Having addressed these preliminary matters, the merits of Ground One are now considered. Mr. Huskisson's counsel was not ineffective for continuing to concede that probable cause existed and failing to contend that Mr. Hardy's signal was "tainted." Any such argument would have been meritless. As explained by the Seventh Circuit, "to determine whether the inclusion of tainted evidence in the warrant application affected the magistrate's decision to issue a search warrant, we evaluate whether the warrant application contained sufficient evidence of probable cause without references to tainted evidence, even when that tainted evidence was recovered from an illegal entry into a home." *Huskisson*, 926 F.3d at 375 (cleaned up). No one disputes that the warrant application references to the methamphetamine discovered in Mr. Huskisson's home were tainted by the illegal search and cannot be considered in the probable-cause analysis. Mr. Huskisson argues that the signal *also* should not be considered in determining whether the warrant contained sufficient evidence of probable cause

because the signal was part of an "uninterrupted course of action" that was "wholly connected" to the illegal entry. *See, e.g.*, dkt. 5 at 15, 23.

While Mr. Huskisson's trial counsel may not have made this argument, his appellate counsel explicitly argued that the information law enforcement obtained before entering Mr. Huskisson's house did not independently establish probable cause, stating, "All that remains here are a series of uncorroborated statements by Hardy, a first time informant with no track record for reliability, and Agent Cline's interpretation of cryptic phone conversations. That is not enough." *United States v. Huskisson*, No. 18-1335, dkt. 24 at 30 (7th Cir. Nov. 8, 2018) ("App. Dkt."). The Seventh Circuit implicitly rejected that argument when it found that the warrant application included "plenty" of untainted evidence of probable cause. Trial counsel cannot have been ineffective for failing to raise an argument that the Seventh Circuit rejected. *See Warren*, 712 F.3d at 1104 (counsel is not ineffective for failing to raise meritless claims).

Mr. Huskisson also fails to explain how adding the "wholly connected" or "uninterrupted course of action" angle to the probable-cause argument would change the result in this case. The Court understands him to be arguing that the signal and the illegal entry were "wholly connected" and part of an "uninterrupted course of action" because the signal is what motivated law enforcement to enter his house. Dkt. 5 at 15 ("That is so, because the signal is what prompted the unlawful entry and since the signal took place prior to the unlawful entry and discovery of the evidence, should be suppressed as fruit of the poisonous tree." (cleaned up)). But the key to the independent source doctrine analysis is whether the issuance of the warrant and the decision to seek it were tainted by illegally obtained evidence. *Huskisson*, 926 F.3d at 374. Mr. Huskisson fails to explain how the illegally obtained evidence—that is, the evidence discovered *after* the illegal entry—could have tainted a signal that was given *before*

11

the illegal entry. To the extent that he is arguing that the signal was tainted because Mr. Hardy was a government agent, an unreliable informant, or both, his arguments fail for the reasons discussed in connection with Ground Two, below. And to the extent that he is arguing that the signal was "tainted" because it shows that law enforcement would not have sought a warrant if drugs were not found in his house, as explained, he cannot make that argument in this proceeding.

In summary, counsel was not ineffective for making the arguments Mr. Huskisson identifies in Ground One.

### B. Ground Two: Government Agent Theory and Lack of Reliability

In Ground Two, Mr. Huskisson focuses on the actions of his first attorney. He contends that his first attorney improperly conceded that there was probable cause for law enforcement to enter Mr. Huskisson's home after Mr. Hardy gave his signal and focused on the exigent-circumstances argument. Instead, Mr. Huskisson contends, counsel should also have investigated and developed other theories for suppressing the methamphetamine found in his house—specifically that Mr. Hardy's signal could not have provided probable cause for entering Mr. Huskisson's house because was acting as a government agent and was not a reliable informant. *See, e.g.*, dkt. 5 at 3, 38-39, 41.

The argument about counsel's allegedly deficient investigation fails because Mr. Huskisson does not allege what additional evidence the investigation would have produced beyond the evidence adduced during the suppression hearing and at trial. *See Long*, 847 F.3d at 920. That leaves the arguments that Mr. Huskisson contends counsel should have made based on the record evidence that was developed.

As to the reliability of Mr. Hardy, on appeal, the United States argued that Mr. Hardy's information was sufficient to establish probable cause under the totality of the circumstances test as applied to information supplied by an informant. App. Dkt. 19 at 21-24. Mr. Huskisson's counsel explicitly confronted that argument in the reply brief, arguing that Mr. Hardy's signal indicating that there were drugs in Mr. Huskisson's house was uncorroborated and, as such, could not provide the probable cause necessary for a warrant. App. Dkt. 24 at 31-33 ("[T]he Court asks whether the warrant affidavit would have provided probable cause for a search even without that tainted evidence. All that remains here are a series of uncorroborated statements by Hardy, a first time informant with no track record for reliability, and Agent Cline's interpretation of cryptic phone conversations. That is not enough . . . . Because informants often have an ulterior motive for implicating others in criminal activity, probable cause requires more than taking their statements at face value.") (internal citations omitted)). The Seventh Circuit implicitly rejected that argument when it concluded that the warrant application included sufficient untainted information showing probable cause to search Mr. Huskisson's residence, and the issue cannot be relitigated now. Nor can Mr. Huskisson's trial counsel be faulted for failing to make an argument that the Seventh Circuit has rejected.

As to the "government agent" argument, Mr. Huskisson devotes most of his briefing to establishing that (a) Mr. Hardy was a government agent, dkt. 5 at 37-39; and (2) the signal was part of a "ruse on part of the agents to have [Mr. Hardy] conduct a confirmatory search to confirm that the residence did indeed have methamphetamine inside," *id.* at 39. But, even if he is correct on those points, they do not change the outcome of this case. Characterizing Mr. Hardy as a "government agent" does not confer a taint of illegality to the signal because Mr. Huskisson consented to Mr. Hardy being in the house and Mr. Hardy saw the methamphetamine

in plain view after being allowed into the house. *See, e.g.*, *United States v. Schmidt*, 700 F.3d 934, 938039 (7th Cir. 2012) (a warrantless seizure is justified if (1) the officer was lawfully present in the place where he viewed the item; (2) the item was in plain view; and (3) its incriminating nature was immediately apparent); *United States v. Diaz*, 814 F.2d 454, 457 n.1 (7th Cir. 1987) ("Only the second entry is at issue here, because the first entry of Agent Mueller into Diaz's hotel room was by consent and therefore clearly lawful.").

The fact that law enforcement put together a "ruse" whereby Mr. Hardy would pretend to be going into Mr. Huskisson's house to complete a drug deal when he was actually a confidential informant also does not change the analysis. In fact, an actual government agent—such as an undercover officer—could have done what Mr. Hardy did without running afoul of the Fourth Amendment. *See, e.g.*, *id.* ("Only the second entry is at issue here, because the first entry of Agent Mueller into Diaz's hotel room was by consent and therefore clearly lawful. The fact that Mueller was [an undercover officer and] not who he appeared to be did not void Diaz's consent."); *United States v. White*, 660 F.2d 1178, 1183 (7th Cir. 1981) (affirming denial of motion to suppress drugs seized after warrantless entry into apartment where defendant was not aware of the true identities of undercover officers he admitted to his apartment and, upon their entry to the apartment, undercover officers saw defendant sifting white powder and holding another bag of white powder; stating, "the entry into White's apartment served investigative purposes and, as such, the entry was permissible even where White's consent was obtained by a ruse"); *cf. United States v. Paul*, 808 F.2d 645, 648 (7th Cir. 1986) ("Paul invited [a confidential informant] into his house and down to the basement, where the marijuana was in plain view. If [the confidential informant] had been a police undercover agent rather than a confidential informant, he could have arrested Paul then and there, and being lawfully in the

14

basement could have seized the drugs because they were in plain view . . . We [have held] that when one invites an undercover agent into his house, the agent can summon other agents to assist in the arrest, and the other agents are not guilty of a violation of the Fourth Amendment. We think the principle extends to the case where the initial, consensual entry is by a confidential informant.").

Mr. Huskisson cites to *Gouled v. United* States, 255 U.S. 298, 305 (1921), to contend that his consent to Mr. Hardy's entry does not matter. But that case is distinguishable. In that case, a business acquaintance of the defendant—acting at the direction of his superior military officers—pretended to make a friendly call on the defendant, gained admission to the defendant's office, and—in the defendant's absence—seized and carried away several documents. *Id.* Unlike the business acquaintance in *Gouled*, Mr. Hardy did not exceed the scope of Mr. Huskisson's consent after he entered the house, and he did not secrete any property away from the house. Instead, he saw the methamphetamine in plain view when he entered the house. As a result, even if Mr. Hardy were acting as a government agent, no Fourth Amendment violation occurred that would require suppressing the information he obtained while in the house or signal he gave alerting law enforcement to what he had seen in the house.

In summary, Mr. Huskisson's counsel was not ineffective for failing to develop and argue the arguments identified in Ground Two.

### IV. Conclusion

For the reasons explained in this Order, Mr. Huskisson is not entitled to relief on his § 2255 motion. There was no ineffective assistance of counsel. Accordingly, his motion for relief pursuant to § 2255 is **DENIED** and this action is dismissed with prejudice. Judgment consistent with this Entry shall now issue and the Clerk shall **docket a copy of this Entry in No. 1:16-**

**cr-00048-SEB-TAB-1.** The motion to vacate (Crim. Dkt. 244) shall also be **terminated** in the underlying criminal action. The **clerk is directed** to update the Petitioner's address on the docket consistent with the distribution portion of this Order.

### V.  Denial of Certificate of Appealability

A habeas petitioner does not have the absolute right to appeal a district court's denial of his habeas petition, rather, he must first request a certificate of appealability. *See Miller–El v. Cockrell*, 537 U.S. 322, 335 (2003); *Peterson v. Douma*, 751 F.3d 524, 528 (7th Cir. 2014). Pursuant to Federal Rule of Appellate Procedure 22(b), Rule 11(a) of the Rules Governing § 2255 proceedings, and 28 U.S.C. § 2253(c), the Court finds that Mr. Huskisson has failed to show that reasonable jurists would find "it debatable whether the petition states a valid claim of the denial of a constitutional right" and "debatable whether [this Court] was correct in its procedural ruling." *Slack v. McDaniel,* 529 U.S. 473, 484 (2000). The Court therefore **denies** a certificate of appealability.

**IT IS SO ORDERED.**

Date:  4/21/2023

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

All Electronically Registered Counsel

Paul M. Huskisson
Reg. No. 15110-028
FCI TERRE HAUTE
FEDERAL CORRECTIONAL INSTITUTION
P.O. BOX 33
TERRE HAUTE, IN  47808